1

2

3

4

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

5

6   GENUINE ENABLING
    TECHNOLOGY LLC,

7                    Plaintiff,

8        v.                                         C19-0351 TSZ

9   NINTENDO CO., LTD.; and                         ORDER
    NINTENDO OF AMERICA INC.,

10

11                   Defendants.

12          THIS MATTER comes before the Court to construe certain claim terms in United

13   States Patent No. 6,219,730 ("the '730 Patent") and to consider the undecided and

14   unstayed portions of a motion for summary judgment, docket no. 90, brought by

15   defendants Nintendo Co., Ltd. and Nintendo of America Inc. (collectively, "Nintendo").

16   Having reviewed the parties' respective claim construction and summary judgment briefs

17   and supporting materials, as well as their responses, docket nos. 147 and 148, to an Order

18   to Show Cause ("OSC") entered on January 13, 2025, docket no. 146, the Court enters

19   the following Order.

20   **<u>Background</u>**

21          This case has a long and complex history.  In this action, plaintiff Genuine

22   Enabling Technology LLC ("Genuine") accuses Nintendo of infringing Claims 10,

23

ORDER - 1

14–18, 21–23, and 25 of the '730 Patent. Ex. 4 to McFarland Decl. (docket no. 72-4 at 3). The '730 Patent discloses an apparatus that functions "as a user-input device (UID) to a computer by using a communication link" and "receives/transmits additional I/O [input/output] signals via the same link." '730 Patent at Abstract (docket no. 1-1). The '730 Patent has twenty-five (25) claims, five (5) of which are independent, namely Claims 1, 14, 16, 19, and 21. *See id.* at 7:61–10:22. Among the independent claims asserted by Genuine in this litigation, Claim 16 is representative and reads:

> An apparatus linked to a computer by a communication link, functioning as a user input device and additionally receiving at least one input signal, comprising:
>
> a user input device producing a user input stream;
>
> an input port receiving at least one input signal;
>
> a converter receiving the at least one input signal for producing an input stream; and
>
> a framer synchronizing the user input stream with the input stream and encoding the same into a combined data stream transferable by the communication link.

*Id.* at 8:54–63. The products accused of infringing the asserted claims of the '730 Patent are Nintendo's game controllers and consoles branded as Wii REMOTE®, Wii Remote Plus, NUNCHUK®, Wii U®, JOY-CON®, and Switch Pro. *See* Ex. 4 to McFarland Decl. (docket no. 72-4 at 3); Ex. 19 to Zeck Decl. (docket no. 90-5).

Over five years ago, in January 2020, the parties filed claim construction briefs, and Nintendo filed a motion for summary judgment in which it asserted multiple grounds for finding invalidity and/or noninfringement of the '730 Patent. In July 2020, the Honorable Ricardo S. Martinez construed the claim term "input signal," and he granted

Nintendo's motion for summary judgment on the ground that the accused devices lacked an "input signal" satisfying certain criteria, including a frequency above 500 Hz. *See* Order (docket no. 123). Given the dispositive nature of his ruling, Judge Martinez did not interpret any other disputed claims terms,[1] and he did not address the other grounds on which Nintendo sought summary judgment. *See* *id.*

In April 2022, the Federal Circuit reversed, holding that summary judgment was improper because the meaning ascribed to the term "input signal" was erroneous. *See* *Genuine Enabling Tech. LLC v. Nintendo Co.*, 29 F.4th 1365 (Fed. Cir. 2022). In September 2023, the parties filed a Joint Status Report, docket no. 136, in which they disagreed about how to proceed. In October 2023, the matter was reassigned to the Honorable Jamal N. Whitehead. About five months later, in other litigation premised on the '730 Patent, the District of Delaware granted summary judgment against Genuine, concluding that, as a matter of law, Genuine could not prove infringement. *See* *Genuine Enabling Tech. LLC v. Sony Corp.*, No. 17-cv-135, 2024 WL 1255513 (D. Del. Mar. 25, 2024), *appeal filed*, No. 24-1686 (Fed. Cir. Apr. 12, 2024). Genuine's appeal from the District of Delaware's decision is currently pending before the Federal Circuit.

In December 2024, this case was reassigned to the undersigned judge. By Order entered January 13, 2025, docket no. 146, the Court deferred ruling on the portion of

---

[1] In denying Nintendo's petitions to institute inter partes review ("IPR") proceedings concerning the '730 Patent, the Patent Trial and Appeal Board declined to construe any claim terms other than "input signal." *See* *Nintendo Co. v. Genuine Enabling Tech. LLC*, No. IPR2018-542, 2018 WL 3760924, at *4 (P.T.A.B. Aug. 6, 2018); *Nintendo Co. v. Genuine Enabling Tech. LLC*, No. IPR2018-543, 2018 WL 3758203, at *4 (P.T.A.B. Aug. 6, 2018).

1   Nintendo's motion for summary judgment that involves the issue now before the

2   Federal Circuit, namely whether the accused devices contain the requisite "framer" or

3   synchronizing-and-encoding means.  _See_ Order at 4 (docket no. 146).  The Court also

4   struck as moot the portion of Nintendo's motion that sought to invalidate the '730 Patent

5   on the ground that the term "input signal" is indefinite.  _Id._ at 5.  As a result, the Court

6   observed that the only undecided and unstayed portions of Nintendo's motion for

7   summary judgment concern (a) whether the terms "framer" or synchronizing-and-

8   encoding means are indefinite, and (b) whether an "input signal" must be received from

9   an external source.  _See id._ at 5–6.  The parties have not stated any disagreement with this

10  outline of the issues raised in Nintendo's summary judgment motion that are still pending

11  before the Court.[2]

12      In addition to narrowing the scope of Nintendo's dispositive motion, in its prior

13  order, the Court directed the parties to show cause why the District of Delaware's

14  interpretations of certain claim terms should not be adopted.  _Id._ at 5 (citing _Genuine_

15  _Enabling Tech. LLC v. Sony Corp._, No. 17-cv-135, 2020 WL 1140910 (D. Del. Mar. 9,

16  2020)).  The parties have no objection to the District of Delaware's interpretations of the

17  terms "input means for producing at least one input signal" and "converter," _see_ Pl.'s

18  _____

19  [2] On remand, Nintendo does not argue that, notwithstanding the Federal Circuit's interpretation
20  of "input signal" as "a signal having an audio or higher frequency," _see_ 29 F.4th at 1375–76; _see_
    _also_ Order at 5 (docket no. 146) (construing "input signal" accordingly), it would still be entitled
21  to summary judgment because its devices do not, as a matter of law, receive or use the requisite
    "input signal."  Thus, to the extent Nintendo sought summary judgment on the theory that the
22  accused devices lack the requisite "input signal," the Federal Circuit's opinion has resolved the
    related portions of Nintendo's motion.

23

1   Resp. to OSC (docket no. 148); Defs.' Resp. to OSC (docket no. 147), and the Court

2   construes these terms in the same manner as the District of Delaware.[3]  The parties also

3   agree that the District of Delaware properly decided not to construe the term "combined

4   data stream," *see* 2020 WL 1140910, at *9 (concluding that "no construction is necessary

5   for the term 'combined data stream'"), and the Court likewise declines to further interpret

6   this term.

7          The parties disagree about whether the Court should adopt the District of

8   Delaware's interpretations of three other terms, namely (i) "framer," also described in

9   Claim 1 (on which Claim 10 depends) as "encoding means for synchronizing," and in

10  Claim 14 as "means for synchronizing and encoding," and appearing in Claim 16 as "a

11  framer synchronizing . . . and encoding," and in Claim 21 as "a framer for keeping . . . in

12  synchrony and encoding," (ii) "converting means," and (iii) "user input means."  With

13  regard to all three terms, Nintendo asks the Court to depart either in part or in toto from

14  the District of Delaware's rulings.  *See* Defs.' Resp. to OSC (docket no. 147).  Genuine

15  accepts the District of Delaware's constructions, with one exception; although Genuine

16  agrees with the District of Delaware's interpretation of "user input means" for purposes

17

18  _____

19  [3] The District of Delaware concluded that 35 U.S.C. § 112(f) does not apply to the term "input
    means for producing at least one input signal" because Claim 10 of the '730 Patent "recites

20  sufficiently definite structure," and it construed "input means" as "an input transducer," which is
    not restricted to the examples in the specification, *i.e.* a microphone or fax/modem device.  *See*

21  2020 WL 1140910, at *11.  For purposes of Claim 18 of the patent, the District of Delaware
    interpreted "converter" as a "circuit for converting (1) the at least one input signal into an input

22  stream and (2) an output stream into the at least one output signal."  *Id.* at *17.

23

of Claim 10, it requests that, in connection with Claims 14 and 15, the Court construe (or rephrase) the term as "user input apparatus." *See* Pl.'s Resp. to OSC (docket no. 148).

In addition to the three aforementioned terms, which were construed by the District of Delaware, the parties in this matter seek interpretations of the following terms: (a) "input port" and "output port," (b) "additionally receiving at least one input signal" and/or "receiving user input signals and additionally at least one digital input signal," and (c) "input stream" or "stream." With regard to the first set of terms ("input port" and "output port"), as well as the previously discussed terms "framer" (synchronizing-and-encoding means) and "converting means," Nintendo asserts indefiniteness and seeks a finding, as a matter of law, that the '730 Patent is invalid. As to the second pair of terms, Nintendo argues that "additionally receiving at least one input signal" and/or "receiving user input signals and additionally at least one digital input signal" should be interpreted to require that an input signal be received from an external source, and that it is entitled to partial summary judgment because all but one of the accused devices do not receive any input signal from an external source. For the third group comprised of the term "input stream" and the word "stream," as well as for the term "user input means," the parties' have proposed different interpretations, but have not asked the Court for any dispositive relief. The Court will first address the potentially dispositive issues (indefiniteness and noninfringement) before turning to the matter of construing "user input means" and "input stream" or "stream."

/ / /

/ / /

**<u>Discussion</u>**

**A.    <u>Summary Judgment Standard</u>**

To grant summary judgment, the Court must be persuaded that no genuine dispute of material fact exists and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a).  The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact.  <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986).  A fact is material if it might affect the outcome of the suit under the governing law.  <u>See</u> <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986).  To survive a motion for summary judgment, the adverse party must present "affirmative evidence," which "is to be believed" and from which all "justifiable inferences" are to be favorably drawn.  <u>Id.</u> at 255 & 257.  Summary judgment is warranted only when the record, taken as a whole, "could not lead a rational trier of fact to find for the non-moving party."  <u>See</u> <u>Matsushita Elec. Indus.  Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986).

**B.    <u>Claim Construction Standards</u>**

The Court has both the authority and the obligation to construe as a matter of law the meaning of language used in a patent claim.  <u>Markman v. Westview Instruments, Inc.</u>, 52 F.3d 967, 979 (Fed. Cir. 1995).  In doing so, the Court must consider the intrinsic evidence in the record,[4] which will consist of the patent claims, the specification, and the

---

[4] The Court may, in its discretion, also consider extrinsic evidence as an aid in deriving the "'true meaning of the language employed' in the patent."  <u>Markman</u>, 52 F.3d at 980 (quoting <u>Seymour v. Osborne</u>, 78 U.S. 516, 546 (1870)).  Extrinsic evidence might include expert or inventor testimony, dictionaries, and learned treatises.  <u>Id.</u>  Extrinsic evidence is generally less reliable than intrinsic evidence in construing the claim terms, and the Court must assess such evidence

1    prosecution history.  *Id.*  The words of a patent claim are generally assigned their

2    "ordinary and customary meaning."  *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed.

3    Cir. 2005).  The ordinary and customary meaning of a claim term is the definition

4    ascribed to it by "a person of ordinary skill in the art in question at the time of the

5    invention."  *Id.* at 1313.  If the specification, however, reveals a definition given to a

6    claim term that differs from the meaning it would otherwise possess, the inventor's

7    lexicography[5] trumps the ordinary and customary, or dictionary, construction.  *Id.* at

8    1316.  Although the specification is "the single best guide to the meaning of a disputed

9    term," it must not be used to import limitations into the claims of the patent.  *See id.* at

10   1315 & 1323.

11        The context in which a claim term is used might also be instructive.  *See id.* at

12   1314.  For example, if a claim refers to "steel baffles," the language implies that baffles

13   are not necessarily made of steel.  *Id.*  Moreover, the other claims of a patent might

14   illuminate the meaning of a term, through consistent usage of the same or a similar term,

15

16

17

18   accordingly, bearing in mind the flaws inherent in each type of extrinsic evidence.  *See Phillips*,
     415 F.3d at 1318–19.  Extrinsic evidence may not be used to vary or contradict the terms of the
     claims in the patent.  *Markman*, 52 F.3d at 981.

19   [5] The prosecution history also evidences how the inventor understood the terms of the patent
     claims.  *Phillips*, 415 F.3d at 1317.  Because the prosecution history, however, reflects an

20   "ongoing negotiation" concerning a patent application, it might suffer from a lack of clarity and
     is often less useful for claim construction purposes than the specification.  *Id.*  In addition,

21   although the prosecution history "can and should be used to understand the language used in the
     claims," it may not itself "enlarge, diminish, or vary" the limitations in the claims.  *Markman*, 52

22   F.3d at 980.

23

1  or inclusion in a dependent claim of an additional term not present in the related

2  independent claim. *Id.* at 1314–15.

3  　　　When the claim terms are clear enough to permit the trier of fact to perform its

4  work, the Court need not engage in further analysis or attempt to rewrite or otherwise

5  alter the language that has received the imprimatur of the United States Patent and

6  Trademark Office. *See Ballard Med. Prods. v. Allegiance Healthcare Corp.*, 268 F.3d

7  1352, 1358 (Fed. Cir. 2001) ("*Markman* does not require a district court to follow any

8  particular procedure in conducting claim construction."); *see also Static Control*

9  *Components, Inc. v. Lexmark Int'l, Inc.*, 502 F. Supp. 2d 568, 575–76 (E.D. Ky. 2007).

10  The Court may refuse a party's "exhortation to attach a synonym to self-defined and

11  simple words" (as in the *Static Control* Court's example of substituting "canine" for

12  "dog") because it invites "a meaningless result that mocks the notion of construction."

13  502 F. Supp. 2d at 575–76.

14  **C.    Indefiniteness**

15  　　　A patent is presumed valid. 35 U.S.C. § 282(a). Such presumption may be

16  overcome on the ground of indefiniteness if a patent's "claims, read in light of the

17  specification delineating the patent, and the prosecution history, fail to inform, with

18  reasonable certainty, those skilled in the art about the scope of the invention." *Nautilus,*

19  *Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 901 (2014). An invalidity defense must be

20  proven by "clear and convincing evidence." *Microsoft Corp. v. i4i Ltd. P'ship*, 564 U.S.

21  91, 95 (2011). Nintendo contends that the following sets of claim terms are indefinite:

22  (1) "framer" (*i.e.*, "encoding means for synchronizing," "means for synchronizing and

23

encoding," "a framer synchronizing . . . and encoding," and "a framer for keeping . . . in synchrony and encoding"); (2) "converting means" or "means for converting"; and (3) "input port" and "output port."  For the reasons explained below, the Court concludes that Nintendo has not met its burden of establishing this invalidity defense.

### 1.    **"Framer"**

The District of Delaware applied § 112(f)[6] with respect to the term "framer," and ruled that the associated function is "[s]ynchronizing the user input stream with the input stream and encoding the user input stream and the input stream into a combined data stream," and the required structure is "[t]he logic design at block 34 in Figure 4A and equivalents thereof."  *See* 2020 WL 1140910, at *14.  The parties agree that § 112(f) governs and that the District of Delaware properly identified the correlating ***function***; however, the parties dispute whether the District of Delaware's description of the related ***structure*** is appropriate.  Genuine supports the District of Delaware's wording, but Nintendo asks the Court to define the structure as "Framer 34, as disclosed in col. 5,

---

[6] Pursuant to § 112(f), also historically referred to as § 112, ¶ 6, "[a]n element in a claim for a combination may be expressed as a means or step for performing a specific function without the recital of structure, material, or acts in support thereof, and such claim shall be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof."  35 U.S.C. § 112(f).  The District of Delaware concluded that § 112(f) governs as to "framer" because the term "fails to connote sufficiently definite structure" to a person of ordinary skill in the art.  2020 WL 1140910, at *13.  The District of Delaware observed that the claims of the '730 Patent "recite 'framer' only in relation to its function, not its structure," and that the prosecution history of the '730 Patent reflects the patentee's characterization of "framer" as "unique" and "novel," as opposed to a structure then available on the market, with which a person of ordinary skill in the art would be familiar.  *See id.*  Finally, the District of Delaware rejected the unsupported opinion of Genuine's expert that a person of ordinary skill in the art would understand the term "framer."  *Id.* at *13–14.

1  ll. 4–64, Fig. 4A, and equivalents thereof."  _See_ Defs.' Resp. to OSC (docket no. 147 at

2  5–6).  The figure at issue is reproduced below.



11  '730 Patent at Fig. 4A (docket no. 1-1 at 9) (modified).  The box labeled "34," which is

12  highlighted in yellow, surrounds the logic symbols that are translated into explanatory

13  text in the specification at Column 5, Lines 4–64 of the '730 Patent.

14      Nintendo asserts that the phrase "logic design" was improperly used, arguing that

15  "logic design" is not a structure, but rather "a generic, black-box label for anything that

16  performs the recited function."  Defs.' Resp. to OSC (docket no. 147 at 17) (citing

17  _Egenera, Inc. v. Cisco Sys., Inc._, 972 F.3d 1367 (Fed. Cir. 2020)).  The case on which

18  Nintendo relies does not, however, support its assertion.  In _Egenera_, the Federal Circuit

19  equated the term "logic," as used in Egenera, Inc.'s patent, with a "'black box recitation

20  of structure' that is simply a generic substitute for 'means.'"  _See_ 972 F.3d at 1374–75.

21  Nintendo's reliance on _Egenera_ ignores the significant difference between "logic" and

22  "logic design."  In this matter, the District of Delaware used the phrase "logic design" as

23

a description of the structure illustrated in block 34 of Figure 4A (and described in the specification) of the '730 Patent.  The phrase "logic design" appropriately characterizes block 34 of Figure 4A, which is a diagram with (i) logic symbols that have universally understood meanings, and (ii) labels or abbreviations that are defined and explained in the specification of the '730 Patent.

Nintendo's proposed construction, which uses the word "framer" to define the claim term "framer," is circular and rejected.  In light of its rulings, the Court need not address Nintendo's additional contention that, "because 'logic design' is a generic non-structural computer-related label, it triggers the Federal Circuit's algorithm requirement." *See* Defs.' Resp. to OSC (docket no. 147 at 18); *see also* Defs.' Op. Br. (docket no. 85 at 20).

The Court ADOPTS the District of Delaware's interpretation of the various "framer" terms.  Nintendo's motion for summary judgment on the theory that the "framer" terms are indefinite is DENIED.

## 2.    **"Converting Means" / "Means for Converting"**

The term "converting means" appears in Claim 1 of the '730 Patent, upon which Claim 10 depends.  The term "means for converting" is found in Claim 17, which depends from Claim 16, the wording of which was reproduced earlier.  The District of Delaware interpreted both terms pursuant to § 112(f) and ascribed to them different functions and structures.  The relevant claim language is as follows:

> **1**.    A user input apparatus operatively coupled to a computer via a communication means additionally receiving at least one input signal, comprising:

user input means for producing a user input stream;

input means for producing the at least one input signal;

*converting means for receiving the at least one input signal and producing therefrom an input stream*; and

encoding means for synchronizing the user input stream with the input stream and encoding the same into a combined data stream transferable by the communication means.

**17**.   The apparatus of claim **16** further comprises means for receiving an output stream from the computer via the communication link and *means for converting the output stream into at least one output signal*.

'730 Patent at 7:61–8:4 & 8:64–67 (docket no. 1-1 at 15) (emphasis added).  The District of Delaware interpreted the above-highlighted language as follows:

| Claim Language | Function | Structure |
|---|---|---|
| converting means for receiving the at least one input signal and producing therefrom an input stream | "Receiving the at least one input signal and producing therefrom an input stream" | "An analog-to-digital converter and equivalents thereof" |
| means for converting the output stream into at least one output signal | "Converting the output stream into at least one output signal" | "A circuit for converting a digital stream into an output signal and equivalents thereof" |

2020 WL 1140910, at *21–22.  Genuine supports adoption of the District of Delaware's constructions; Nintendo agrees with the District of Delaware's descriptions of ***functions***, but not its identification of ***structures***.  *See* Pl.'s Resp. to OSC (docket no. 148); Defs.' Resp. to OSC (docket no. 147).  Nintendo proposes that the structures for both claim terms be instead identically defined as:  "Codec, as disclosed in '730 Patent at 4:15–18, 4:25–28, 4:47–52, 5:6–9, [5:]15–19, [5:]39–41, Figs. 2C, 3A, and 4A; and equivalents thereof."  Defs.' Resp. to OSC (docket no. 147 at 8).  The District of Delaware explicitly

rejected the concept of limiting the "converting means" or "means of converting" to a

"codec," which is "a combined analog-to-digital converter and digital-to-analog

converter." [7]  *See* 2020 WL 1140910, at *21–22; *see id.* at *16 n.9.  The District of

Delaware reasoned that the specification of the '730 Patent disclosed a "codec" as "only

one embodiment" or "a preferred embodiment" of a "converter," "converting means," or

"means of converting," and in the absence of a disclaimer, the District of Delaware

refused to restrict the scope of structure for these § 112(f) terms to a "codec."  *Id.* at *21–

22.

Nintendo contends that the District of Delaware erred, citing *Saffran v. Johnson &*

*Johnson*, 712 F.3d 549 (Fed. Cir. 2013), for the proposition that a means-plus-function

term must "be limited to the specific structures disclosed in the specification."  *See* Defs.'

Resp. to OSC (docket no. 147 at 22).  *Saffran*, however, does not support, but rather

undermines, Nintendo's analysis.  In *Saffran*, the Federal Circuit distinguished a prior

case in which the district court had construed a means-plus-function term ("air circulation

means") as requiring structures for both circulating and recirculating air.  712 F.3d at 563

---

[7] Nintendo's expert, Harry Bims, Ph.D., disagrees with the District of Delaware's understanding of the term "codec," even though it is consistent with at least one dictionary.  *See* FACTS ON FILE DICTIONARY OF COMPUTER SCIENCE 37 (rev. ed. 2006), Pl.'s Ex. 28 (docket no. 93-8) (defining "codec" as "[a]n integrated circuit or chip that performs analog-to-digital conversion and vice versa").  According to Bims, "the primary purpose of a codec is to encode and decode digital data, and not to convert analog data to digital data or vice versa."  Bims Decl. at ¶ 9(a), Ex. 11 to Krohn Decl. (docket no. 85-12).  Bims has explained that the word "codec" was coined as a contraction of "coder/decoder," and he asserts that some "codecs" do not include either an analog-to-digital or digital-to-analog converter because they receive and transmit only digital signals.  *See id.* at ¶¶ 9(a)&(b).  This testimony actually contradicts Nintendo's position that "codec" should be substituted for "analog-to-digital converter and equivalents."

ORDER - 14

1  (citing *Wenger Mfg., Inc. v. Coating Mach. Sys., Inc.*, 239 F.3d 1225 (Fed. Cir. 2001)).

2  Based on the principle of patent claim differentiation, the Federal Circuit held in *Wenger*

3  that "air circulation means" should not have been interpreted as requiring "structure

4  capable of performing *the additional function* of recirculation" because the circulating

5  function was recited in an independent claim, while the recirculating function appeared in

6  a separate, dependent claim. *See id.* (emphasis in original, citing *Wenger*, 239 F.3d at

7  1232–35). Similarly, in this case, the claim terms themselves contemplate conversion of

8  signals or streams in only one direction, *i.e.*, from analog to digital, or from digital to

9  analog, and thus, they cannot be construed as requiring a structure that can perform both

10  types of conversion (namely, a "codec").

11      In its opening claim construction brief, without any explanation, Nintendo asserted

12  that the terms "converting means" and "means for converting" are indefinite because no

13  algorithm has been disclosed. *See* Defs.' Op. Br. (docket no. 85 at 24). The argument

14  was not further developed in Nintendo's motion for summary judgment, docket no. 90,

15  responsive claim construction brief, docket no. 92, or response to the OSC, docket

16  no. 147. The Court declines to conduct an indefiniteness analysis based on Nintendo's

17  roughly four lines of text aimed at three different claim terms ("converting means,"

18  "means for converting," and "user input means"), particularly given that Nintendo bears

19  the burden of proof by clear and convincing evidence. *See* Defs.' Op. Br. (docket no. 85

20  at 24). The Court ADOPTS the District of Delaware's interpretations of the terms

21  "converting means" and "means for converting," and to the extent Nintendo seeks

22  summary judgment on the theory that these terms are indefinite, its motion is DENIED.

23

1    ### 3.    **<u>"Input Port" and "Output Port"</u>**

2    The District of Delaware did not construe the terms "input port" and "output port."

3    Nintendo contends that the terms are indefinite. Defs.' Op. Br. (docket no. 85 at 25). In

4    the alternative, Nintendo asks the Court to construe the terms as meaning "a receptor for

5    detachable connection" to either "a signal source" or "an output device," respectively.

6    <u>*See id.*</u> In contrast, Genuine believes that the terms are "straightforward" and require no

7    interpretation by the Court. Pl.'s Op. Br. (docket no. 86 at 37). Genuine further asserts

8    that Nintendo's proposed meanings improperly import a limitation (<u>*i.e.*</u>, detachability)

9    into the related claims of the '730 Patent. <u>*See id.*</u> The Court agrees with Genuine.

10    The term "input port" appears in independent Claims 16 and 21 and in Claim 25

11    (which depends from Claim 21). Claim 16 requires "an <u>*input port*</u> receiving at least one

12    input signal," Claim 21 includes "an <u>*input port*</u> for producing the at least one digital input

13    signal," and Claim 25 indicates that "the <u>*input port*</u> receives the at least one digital input

14    signal from an external device." '730 Patent at 8:58, 10:2–3, & 10:20–22 (docket no. 1-1

15    at 15–16) (emphasis added).

16    The term "output port" appears in only Claim 18, which reads:

17    The apparatus of claim **16** wherein the converter further comprises an
18    <u>*output port*</u> wherein the framer further receives an output stream from the
     computer via the communication link, the output stream being further
     received and converted by the converter into at least one output signal
19    going to the <u>*output port*</u>.

20    <u>*Id.*</u> at 9:1–6 (docket no. 1-1 at 16) (emphasis added).

21    In arguing that the terms "input port" and "output port" are indefinite, Nintendo

22    relies on its expert's statement that a person of ordinary skill in the art would need a

23

"qualifier" to understand the terms because "an input port for computer audio is different than an input port in another context, such as a mouse port." Bims Decl. at ¶ 79, Ex. 10 to Krohn Decl. (docket no. 85-11); *see* Defs.' Op. Br. (docket no. 85 at 25–26). This view entirely ignores the preambles of the independent claims at issue, which disclose an "apparatus" or "a user input apparatus," respectively, that is "linked" or "operatively coupled" to a computer "by" or "via" a "communication link." *See* Claims 16 & 21, '730 Patent at 8:54–56 & 9:22–25 (docket no. 1-1 at 15–16). Indeed, Claim 16 specifies that the disclosed "apparatus" is "functioning as a user input device." '730 Patent at 8:55 (docket no. 1-1 at 15). The specification explains that a user input device is typically a mouse, trackball, keyboard, pressure tablet, or pen-based input device. *Id.* at 1:17–19 (docket no. 1-1 at 12). Thus, even if a "qualifier" is required, the '730 Patent clearly articulates a context for the terms "input port" and "output port," and the terms are not indefinite.

Moreover, the terms require no construction. The terms "input port" and "output port" and their components "input," "output," and "port" are commonly used, and they are known even to those who are not persons of ordinary skill in the art. The ways in which the terms are used in Claims 16, 18, 21, and 25 are consistent with their ordinary meanings and do not suggest some unusual lexicography. *See* WEBSTER'S THIRD NEW INT'L DICTIONARY 1167 & 1603 (1981) (defining "input" as "data or similar information fed into a computer or accounting machine" and "output" as "the information fed out by a computer or accounting machine"); DATA & TELECOMMS. DICTIONARY 568, Pl.'s Ex. 18 (docket no. 86-18 at 6) (defining "port" as "1. Point of ingress or egress, or both. Data

1    input/output point.  2. Entrance or exit to a network, firewall, or gateway; a transmissions

2    interface.  3. Data input or output path to peripheral devices such as modems and

3    printers.").  The Court concludes that the terms "input port" and "output port" mean what

4    they say.

5            Nintendo's alternative contention that "input port" should be interpreted as "a

6    receptor for detachable connection to a signal source" is unsupported by any analysis in

7    its expert's declaration, see Bims Decl. at ¶ 79, Ex. 10 to Krohn Decl. (docket no. 85-11),

8    and it is not well explained in Nintendo's claim construction briefing.  Nintendo suggests

9    that detachability is required because the specification refers to (i) "a communication

10   port," which is "usually" incorporated in "hand-held computers or embedded systems,"

11   see '730 Patent at 1:57–60 (docket no. 1-1 at 12), (ii) the ability of the invention in the

12   '730 Patent to "handle I/O signals sent from/to an external I/O device, such as an external

13   fax/modem device or even another conventional" user input device, see id. at 2:26–29,

14   and (iii) an embodiment that uses a RS-232 cable, see id. at 3:12–13 & Fig. 3A (docket

15   no. 1-1 at 8 & 13).  See Defs.' Op. Br. (docket no. 85 at 26).  The first phrase from the

16   '730 Patent's specification concerns existing or prior art, not the invention at issue, and

17   thus, does not support Nintendo's position.  The second sentence from the specification

18   merely touts an advantage of the invention, and the third segment of the specification

19   discusses just one embodiment; neither portion of the specification is in any way limiting.

20   See Liebel-Flarsheim Co. v. Medrad, Inc., 358 F.3d 898, 906 (Fed. Cir. 2004) ("Even

21   when the specification describes only a single embodiment, the claims of the patent will

22

23

ORDER - 18

not be read restrictively unless the patentee has demonstrated a clear intention to limit the claim scope using 'words or expressions of manifest exclusion or restriction.'").

Nintendo's reliance on _Secure Axcess, LLC v. Nintendo of America, Inc._, No. C14-1013 RSM, 2015 WL 4167956 (W.D. Wash. July 9, 2015), is similarly misplaced.  In _Secure Axcess_, the invention at issue was a "translative video adaptor" or "TVA," that provided an alternative to complicated and expensive dual-display computer systems.  _Id._ at *1–2.  Rather than using a separate graphics adapter card for each computer monitor, the TVA split a computer's data stream, allowing the same data to be viewed on two or more monitors.  _Id._ at *2.  The _Secure Axcess_ Court construed the term "TVA input port" to mean "an input terminal or connection point in the TVA that allows for a device to be detachably connected to the TVA."  _Id._ at *13–14; _see also_ Defs.' Resp. Br. (docket no. 92 at 14–15) (quoting _Secure Axcess_).  The first two claims of the patent-in-suit in _Secure Axcess_ made clear that a structure (_i.e._, a "TVA input port") was necessary to perform the steps of the method disclosed in the claims, and that the "TVA input port" allowed "the TVA to be attached to a device in order to receive the processed video signal to be read out onto a secondary monitor."  2015 WL 4167956, at *14.  The specification of the patent-in-suit also made clear that the "TVA input port" was detachable, being "coupled" with a computer through a "cable" or a "necessary third connector."  _Id._

In contrast, in this matter, the apparatus at issue may communicate with a computer in a "wired (via cable) or wireless (via electromagnetic wave)" manner.  '730 Patent at 2:37–28 (docket no. 1-1 at 12).  No "detachable connector" (physical cable)

between the disclosed apparatus and a computer is required. _Secure Axcess_ is therefore

distinguishable, and the Court declines Nintendo's invitation to inappropriately import

the limitations of detachability and/or connectability into the claims of the '730 Patent.

To the extent Nintendo seeks summary judgment on the grounds that the terms "input

port" and "output port" are indefinite and/or require a detachability or connectability that

the accused products do not possess, its motion is DENIED. Nintendo's related

contention that an "input port" must be connected (detachably or otherwise) to an

external device, which generates the requisite "input signal," is addressed in the next

section.

D.    **Infringement (Input Signal From External Source)**

Nintendo asks the Court to construe the terms "additionally receiving at least one

input signal" and "receiving additionally at least one digital input signal" as meaning

"[t]aking in an input signal from an external source," _see_ Defs.' Op. Br. (docket no. 85 at

24), and it contends that, if the terms are defined in this manner, Genuine cannot, as a

matter of law, prove infringement.[8]  Nintendo's proposed interpretation completely

disregards the principle of claim differentiation. The presence of a particular limitation in

---

[8] In connection with its contention that the claim terms at issue require an external source, Nintendo asserts that Genuine has accused only the NUNCHUK® of receiving an input signal from an external device. _See_ Defs.' Mot. (docket no. 90 at 22). The exhibit Nintendo has cited for support, however, indicates that, in addition to the NUNCHUK®, Genuine accuses both the Wii REMOTE® and the Wii Remote Plus of having an input port that receives an input signal from an external device. _See_ Pl.'s Disclosure of Asserted Claims & Infringement Contentions at 70–71, Ex. 19 to Zeck Decl. (docket no. 90-5). Thus, even if the Court were to adopt Nintendo's proposed construction, Genuine's infringement claims would remain, not only as to the NUNCHUK®, but also as to the Wii REMOTE® and Wii Remote Plus.

a dependent claim "raises a presumption that the limitation in question is not found in the independent claim." _Acumed LLC v. Stryker Corp._, 483 F.3d 800, 806 (Fed. Cir. 2007) (quoting _Liebel-Flarsheim Co. v. Medrad, Inc._, 358 F.3d 898, 910 (Fed. Cir. 2004)). This presumption "is especially strong when the limitation in dispute is the only meaningful difference between an independent and dependent claim, and one party is urging that the limitation in the dependent claim should be read into the independent claim." _Id._ (quoting _SunRace Roots Enter. Co. v. SRAM Corp._, 336 F.3d 1298, 1303 (Fed. Cir. 2003)).

Dependent Claim 25 of the '730 Patent contains the limitation that the input signal be received by the input port "from an external device." '730 Patent at 10:20–22 (docket no. 1-1 at 16). This sole basis of distinction between Claim 25 and the independent claim from which it depends (_i.e._, Claim 21) raises a presumption, unrebutted by Nintendo, that the independent claims (Claims 16 and 21) and other dependent claims (Claims 10, 17, 18, 22, and 23) at issue do not require that the input signal be received from an external source. To the extent that Nintendo seeks partial summary judgment on the ground that all accused devices other than the NUNCHUK® do not infringe the asserted claims of the '730 Patent because they do not receive an input signal from an external device, its motion is DENIED.

**E.    Additional Claim Terms**

**1.    "User Input Means"**

The District of Delaware construed "user input means" pursuant to § 112(f) as indicating the function of "[p]roducing a digital stream, called the user input stream," and

1   having a structure of "[a] sensor translating user-initiated actuations and an encoder and

2   equivalents thereof."  2020 WL 1140910, at *20.  For purposes of Claim 10 of the

3   '730 Patent, Genuine accepts the District of Delaware's ruling.  *See* Pl.'s Resp. to OSC

4   (docket no. 148 at 3–5).  Nintendo disagrees with both parts of the District of Delaware's

5   interpretation, arguing that the function should be defined as "[p]roducing a user input

6   stream," and that the structure should be limited to "[m]ouse, trackball, keyboard,

7   pressure tablet, [and] pen-based input device" and equivalents thereof.  *See* Defs.' Resp.

8   to OSC (docket no. 147 at 7).  Nintendo fails to explain why it wishes the Court to omit

9   the limitation of a "digital" stream, which the District of Delaware included after a

10  thorough analysis.  *See* 2020 WL 1140910, at *19–20.  The Court declines to disturb the

11  District of Delaware's description of the function associated with the term "user input

12  means."

13          With regard to structure, the District of Delaware rejected the proposition that

14  "user input means" should be restricted to items identified as "typical" user input devices.

15  *See id.* at *20; *see also* '730 Patent at 1:17–19 (docket no. 1-1 at 12).  Nintendo accuses

16  the District of Delaware of erring, but its argument fails to acknowledge that the list of

17  user input devices on which it relies relates to prior art, as opposed to any embodiment of

18  the invention disclosed in the '730 Patent.  Moreover, as the District of Delaware aptly

19  concluded, even if the examples of user input devices were preferred embodiments,

20  limiting the structure of "user input means" to such items would be improper absent a

21  disavowal by the inventor of claim term scope.  2020 WL 1140910, at *20.  Nintendo

22  having cited to no such disavowal in the prosecution history, the Court ADOPTS

23

the District of Delaware's interpretation of "user input means," at least for purposes of Claim 10 of the '730 Patent.

With regard to Claims 14 and 15, Genuine now contends that the term "user input means" was mistakenly introduced by the patent examiner when the claims were allowed, and that the words "user input *apparatus*" should appear instead of "user input *means*." *See* Pl.'s Resp. to OSC (docket no. 148 at 4–5) (emphasis added); *see also* Report of Kenneth W. Fernald, Ph.D., Ex. 1 to Pl.'s Resp. to OSC (docket no. 148-1 at 3–5).  This argument was not raised in Genuine's opening or responsive claim construction briefs, docket nos. 86 and 93, and Nintendo has had no opportunity to reply.  Moreover, in asserting that the Court could correct an alleged scrivener's error in Claims 14 and 15, Genuine has not cited any authority or analyzed whether the applicable standards[9] have been met.  The Court therefore DEFERS ruling on how "user input means" should be construed for purposes of Claims 14 and 15 of the '730 Patent.

### 2.    "Input Stream" or "Stream" [10]

The parties essentially agree on the meaning of the term "input stream."  Genuine proposed the following construction:  "A data stream that is produced by converting the

_____

[9] *See Pavo Sols. LLC v. Kingston Tech. Co.*, 35 F.4th 1367, 1373 (Fed. Cir. 2022) ("A district court may correct 'obvious minor typographical and clerical errors in patents.'  Correction is appropriate 'only if (1) the correction is not subject to reasonable debate based on consideration of the claim language and the specification and (2) the prosecution history does not suggest a different interpretation of the claims.'  The error must be 'evident from the face of the patent,' and the determination 'must be made from the point of view of one skilled in the art.'" (citations omitted)).

[10] Nintendo criticized the Order to Show Cause for not including "input stream," *see* Defs.' Resp. to OSC (docket no. 147 at 9 n.2), but this claim term is missing from the OSC's list because

input signal from analog to digital and which is representative of the input signal." *See* App'x A to Joint Claim Constr. & Prehr'g. Stmt. at 155–56 (docket no. 84-1). Nintendo agreed with the first portion of Genuine's suggested definition, *i.e.*, "[a] data stream that is produced by converting the input signal from analog to digital." *See id.* Nintendo did not address the construction of "input stream" in either of its claim construction briefs, *see* Defs.' Op. Br. (docket no. 85); *see also* Defs.' Resp. Br. at 11 n.10 (docket no. 92) (indicating that "input stream" was not among the top ten disputed claim terms), and the Court will not interpret the constituent word "stream" in a manner that is inconsistent with, or more limiting than, the conceded meaning of the term "input stream."

As a result, the Court rejects Nintendo's proposed interpretation of "stream" as "[a] continuous flow of digital data without address information." *See* Defs.' Op. Br. (docket no. 85 at 26); *see also* Defs.' Resp. to OSC (docket no. 147 at 23) (indicating that Nintendo withdraws the latter portion of its definition, which reads "without address information"). The Court agrees with Genuine that the word "stream" requires no construction. It does not appear on its own in any claim of the '730 Patent, but rather always accompanied by one of the modifiers "user input," "input," "combined data," or "output," as in "user input stream," "input stream," "combined data stream" (a term that the parties have agreed need not be construed), and "output stream." *See* '730 Patent at Claims 1, 2, 5, 8, 12, 14, 16–19, & 21 (docket no. 1-1). With regard to at least two of the

_____

(i) the District of Delaware neither construed nor declined to construe "input stream," and (ii) the parties' Joint Status Report filed on July 19, 2024, docket no. 144, did not identify the term "input stream" or the word "stream" as outstanding claim construction issues.

ORDER - 24

terms in which "stream" is a component, namely "input stream" and "combined data

stream," Nintendo has not sought to include flow continuity as a requirement, and

Nintendo has not explained why a "user input stream" or "input stream" might not have

different characteristics than a "combined data stream" or "output stream."  Thus, the

Court will not import a limitation of "continuous flow" into the terms "user input

stream," "input stream," "combined data stream," or "output stream" by interpreting the

word "stream" in the manner proposed by Nintendo.

**Conclusion**

> For the foregoing reasons, the Court ORDERS:

> (1)    The District of Delaware's interpretations of the terms (i) "input means for

producing at least one input signal," (ii) "converter," (iii) "framer" (*i.e.*, "encoding means

for synchronizing," "means for synchronizing and encoding," "a framer synchronizing

. . . and encoding," and "a framer for keeping . . . in synchrony and encoding"), and

(iv) "converting means" / "means for converting" are ADOPTED.  The District of

Delaware's construction of the term "user input means" is ADOPTED for purposes of

Claim 10 of the '730 Patent.  The Court DEFERS ruling on the meaning of the term "user

input means" in connection with Claims 14 and 15 of the '730 Patent.  The Court

DECLINES to further define the terms "combined data stream," "input port," "output

port," "input stream," or "stream."

> (2)    The unstayed portions of Nintendo's motion for summary judgment, docket

no. 90, are DENIED.  Nintendo has failed to establish by clear and convincing evidence

that the '730 Patent is invalid because the "framer," "converting means," and/or "port"

terms are indefinite.  Nintendo has also failed to show that, as a matter of law, the

accused devices do not infringe the '730 Patent because they do not satisfy the claim limitations of "additionally receiving at least one input signal" or "receiving additionally at least one digital input signal."

(3)    This case is hereby STAYED pending the Federal Circuit's resolution of the appeal in <u>Genuine Enabling Tech. LLC v. Sony Corp.</u>, Case No. 24-1686, because the portion of Nintendo's motion for summary judgment that involves issues now before the Federal Circuit has been stayed, <u>see</u> Order at 4–5 (docket no. 146), and thus, this matter cannot proceed toward trial absent further guidance from the Federal Circuit.  The parties are DIRECTED to meet and confer and to file a Joint Status Report within fourteen (14) days after the Federal Circuit issues a decision or by September 30, 2025, whichever occurs earlier.

(4)    The Clerk is directed to send a copy of this Order to all counsel of record.

IT IS SO ORDERED.

Dated this 31st day of March, 2025.

Thomas S. Zilly
United States District Judge